STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. DANIEL F. ROGERS AND ALFRED K. LARSEN, IMPLEADED, ETC., PLAINTIFFS IN ERROR.

Argued May 1, 1928—Decided December 7, 1928.

Before GUMMERE, CHIEF JUSTICE, and Justices PARKER and KATZENBACH.

For the plaintiffs in error, *Wilbur A. Mott* and *George T. Vickers.*

For the state, *George K. Large* and *Johnson V. Aller,* prosecutor of the pleas.

The opinion of the court was delivered by

PARKER, J. The plaintiffs in error, with some fourteen others, were indicted at the December term, 1926, of the crime of manslaughter in that they "with dangerous weapon did feloniously kill and slay Beatrice B. Meancy." All were

tried together; plaintiffs in error were convicted, and the other fourteen acquitted. Two of the fourteen, Hanaway and Dusenberry, were agents of the S. P. C. A.; the other twelve, as well as Rogers and Larsen, were members of the state police; Rogers, a lieutenant, Larsen a private. Beatrice Meaney was killed by a rifle bullet fired from a high power rifle, at about two A. M. while she was in a closet of the Meaney homestead, or some other part of the house.

The general circumstances leading up to the shooting of Beatrice are not in substantial dispute. Her brother Timothy was a farmer and had a herd of cattle. The chief of police of Flemington notified the superintendent of the S. P. C. A. at Newark that complaint was made to him that Timothy was starving his cattle, and suggested an investigation. Hanaway and Dusenberry were detailed to investigate; they went to the farm after visiting a local justice of the peace, found Timothy Meaney and told him their errand. Timothy ordered them off the place, whereupon they went back to the justice and reported what had happened, and the justice, without any sworn or written complaint other than a memorandum from the S. P. C. A. office issued a warrant, which does not seem to be in evidence, armed with which Hanaway, Dusenberry and a constable returned to the farm and arrested Timothy Meaney and started with him to the justice, but reconsidered, released him, went back to the justice and obtained another warrant purporting to authorize a search of the premises and the arrest of Timothy. This warrant was handed to the defendant Larsen, who, accompanied by Hanaway, Dusenberry and a garage man named Terriberry, went back to the Meaney farm and up to the house, knocked and asked for Timothy. It was then after dark. A woman (Beatrice, probably) called out, "Get out of here." The party left the house and went to the barn; finding no one they returned toward the house and met Timothy's brother James, who ordered them off the property. Larsen announced himself as one of the state police and said he had a warrant. James, as claimed by the defense (he tells a different story) ordered them off and threatened Larsen with a cane or stick,

which was taken away from him and he was put under arrest, and the party attempted to put him in a wagon when Timothy appeared with a shotgun and made them release him. Somewhat later, Larsen met James in the road and shot him in the knee. See State *v.* Larsen, No. 4, of the present term.

Space is wanting for a full recital of the occurrences that succeeded those just related. It is plain that Larsen reported to his superiors and that reinforcements of state police were ordered up, and came. About ten o'clock they broke in the front door of the house and discharged their revolvers a number of times. Timothy fired back and wounded one of the police named Daly. Finally some twenty-four state police had assembled, defendant Rogers in command, and apparently determined at almost any cost to get Timothy out of the house and under arrest, dead or alive, for what they did was to use modern implements of war; high power Springfield rifles; tear gas bombs, and "tanks" of gas. With these, about midnight, a siege began, and was continued till early morning. The besiegers, some of them, took cover and discharged their rifles at the house, one bullet mortally wounding Beatrice. James, with his wounded knee, was inside and according to his testimony "it was a continual shooting on up to midnight, and after midnight there was also shooting, and tear bombs, gas bombs and shooting together * * * the tear bombs and gas bombs were thrown in the house and they were still shooting just the same * * *. I had an injured leg and I was gassed * * * I called to them to get a doctor and a priest, they had us all shot up." According to Timothy there were more than a hundred shots fired mostly from the front. "You could hear them [the bullets] coming in the house, going through the woodwork and through the plaster and you could hear them tearing through everything in the house." The witness Kinney said he counted over three hundred and ninety bullet holes. A flare of some kind was thrown into the house and burned for ten or fifteen minutes. The house was full of gas before morning, when the police finally gained admittance, and Timothy threw up his hands and submitted to arrest. Beatrice was dying from the wound

of a rifle bullet which passed through her body in the abdominal region. The "barrage" of rifle shots, as Rogers called it, and the use of tear and gas bombs were under the control and by the orders of Rogers, as developed by his testimony at the coroner's inquest, which was put in evidence at the trial.

The court charged the jury fully on the rights of the officers to make an arrest of Timothy—first, under the warrant; secondly, without warrant for resisting arrest; third, without warrant, to arrest Timothy for the rescue of James; fourth, to arrest James for resisting Larsen in the execution of the warrant against Timothy; stated the law as to the amount of force authorized in order to overcome such resistance; told them that the question of guilty or not guilty depended on their finding, "whether all these defendants or some of them used more force than was necessary or reasonably appeared to be necessary to accomplish their object;" and in response to a request that "if the death of Miss Meaney was caused by a shot fired at the house in an effort to effect the arrest of Timothy Meaney, the liability and rights of the officers and troopers are the same as if Timothy Meaney had been killed."

Counsel for plaintiffs in error frankly concede that they make no complaint of the charge, so it requires no discussion on our part. There are eleven assignments of error, and under a certificate of the entire record of the trial, pursuant to section 136 of the Criminal Procedure act, ten specifications of causes for reversal for each plaintiff in error, which are mutually identical in form. The points made may be thus summarized:

1. That the verdict is against the weight of evidence, assignments 1 and 11; specification 10; particularly as to Larsen, assignment 2; as to Rogers, assignment 3.

2. That the court refused to direct a verdict of acquittal of the defendants respectively, specifications 1 and 2, Larsen and Rogers.

3. Assignments 4 to 10, inclusive, are identical with specifications 3 to 9, inclusive, for each defendant, and all relate to

rulings on evidence. Assignment 8 and the corresponding specifications numbered 7 are abandoned.

As we have said no attack is made on the judge's charge, in fact, it is expressly conceded that it was legally sound.

It will be seen, therefore, that the points made for reversal are that the verdict was against the weight of evidence; that there was no evidence to warrant the submission of the case to the jury, and that the court erred in certain rulings on the admission and rejection of evidence.

The verdict was clearly not against the weight of evidence. The law being settled by the judge and not questioned, the problem put to the jury to solve was whether in order to accomplish the arrest of Timothy Meaney pursuant to the warrant, or for the offense of resisting an officer, it appeared that twenty-four state police used more force than actually was, or reasonably appeared to be necessary, when they resorted to tear bombs, a gas tank, or gas tanks, and a protracted fusillade of high powered rifles against three civilians, at midnight and in the small hours of the morning. To our thinking, if we were sitting as jurors, to state the question would be to answer it. So concluding, the point that there was no evidence to go to the jury is also answered. It is needless to do more than allude to the fundamental rules relating to concerted action, which the judge stated quite as favorably to the defendants as it was proper for him to do. As to convicting two and acquitting fourteen, the verdict may well be accounted for on the theory that the jury approved the comments of the judge relative to the two S. P. C. A. men, Hanaway and Dusenberry, and in view of the fact that the other twelve, all of them state police, were *quasi*-military men acting under orders, concluded not to visit them with the severity of their condemnation, but to reserve it for Larsen, the first on the ground and who as they might well find, had set the whole affair on foot, and Rogers, who was in command and by whose orders a farmhouse, containing, besides Timothy, a wounded man and a helpless woman, was bombarded at midnight.

The other assignments and specifications, as already pointed out, relate to rulings on evidence. Those that are argued fall

into two groups—first, exclusion of two questions asked of Timothy Meaney on cross-examination, whether he had told Judge Large certain things that Judge Large had stated as facts in his opening for the state (assignments 6 and 7, specifications 5 and 6). They were objected to on the ground, among others, that they were not proper cross-examination; and we think that on this ground the exclusion was proper. Nothing had been said in the direct examination about what the witness had told Judge Large; and as to the theory of impeachment by inconsistent statements, the opening by Judge Large stated facts that he expected to prove, but not the source of his information; the defense made no claim that they had any evidence to show such a statement by Timothy to Large, and frankly stated that they proposed to find out where Large got his information if they had to cross-examine every state witness to discover it. So the questions were not directed to credibility at all.

Secondly, introduction by the state of evidence tending to show the wounding of James Meaney by Larsen earlier in the evening; assignments 4, 9 and 10, or specifications 3, 8 and 9. The point made is that this was a separate and distinct offense and obnoxious to the rule excluding proof of other similar offenses. The answer is, that the attempt to arrest Timothy began certainly in the early evening when Larsen, Hanaway, Dusenberry and Terriberry, Larsen holding the warrant, knocked on the door of Timothy's house. The jury were entitled to find that all that followed, the meeting with James, his arrest, his rescue by Timothy, the meeting of Larsen and James in the road and the shooting of James by Larsen, the reinforcements, the barrage and gas attack, and everything up to the final capture in the grey morning, formed incidents in one continuous transaction, all of which were relevant to the killing of a woman by a rifle bullet. The rule as laid down in 30 *C. J.* 193, reads as follows:

"In a prosecution for homicide, evidence of connected acts and transactions leading up to, and explanatory of, the killing is admissible."

Illustrations of the principle will be found in *Rosc. Cr. Ev.*

74, 75, and in *Whart. Hom.* (*1st ed.*), § 700. The remarks of the late Mr. Justice Garrison in *State* v. *Deliso,* 75 *N. J. L.* 808 (at *pp.* 816, 817), and of Judge White in *State* v. *Ehlers,* 98 *Id.* 236 (at *pp.* 238, 239), are also illustrative.

This covers, we think, all the points urged for reversal of the conviction. The judgment will be affirmed.